# ORIGINAL

FILED
U.S. DISTRICT COURT

2009 JUL 22 AM 8:18

CLERK _L. Flenders_
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

BOBBY RUTLEDGE, )
)
        Plaintiff, )
)
v. )     CV 307-055
)
DR. FNU LIFT, et al., )
)
        Defendants. )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Plaintiff, an inmate currently incarcerated at Macon State Prison, in Oglethorpe, Georgia, commenced this civil action pursuant to 42 U.S.C. § 1983. Plaintiff is *pro se* and proceeding *in forma pauperis*. This matter comes before the Court on Defendants' motion for summary judgment. (Doc. no. 64). Plaintiff opposes Defendants' motion. (Doc. nos. 70, 72). For the reasons stated below, the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED**, that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of Defendants.

## I. STATEMENT OF FACTS

### A.    Factual History

The events forming the basis of Plaintiff's complaint occurred while Plaintiff was incarcerated at Telfair State Prison ("TSP") in Helena, Georgia. In his complaint, Plaintiff alleges that Defendants violated his civil rights based on improper medical care, the conditions of his confinement, and acts of retaliation. The Court sanctioned Plaintiff's claims

against Defendants Lift, Herman, Farmer, and Madison regarding his medical treatment, as well as his claims against Defendant Burnette regarding alleged acts of retaliation and the conditions of Plaintiff's confinement in administrative segregation. (Doc. no. 18, pp. 4-5).

From September 1997 to March 1998, Plaintiff received B-12 treatments once a week, and in March 1998, he began receiving B-12 treatments at higher doses twice a week.[1] (Doc. no. 72, p. 3) (hereinafter "Pl.'s Aff."). In November 2001, Plaintiff had blood work done while he was incarcerated at Hays State Prison that indicated a B-12 level of over 2000, which is not indicative of a B-12 deficiency. (Doc. no. 65, Ex. B, p. 2 (hereinafter "Herman Aff.")); Pl.'s Aff. at 3). On December 20, 2001, upon his transfer to TSP, Plaintiff was examined by Defendant Herman, a physician's assistant at TSP, who conducted an "extensive workup" and "a complete blood analysis." (Herman Aff., pp. 1, 3).[2] At this time, Defendant Herman learned that the physician who performed the blood work at Hays State Prison had recommended that Plaintiff avoid B-12 medications. (Id., Ex. B-1). Accordingly, Defendant Herman did not renew Plaintiff's B-12 prescription. (Id. at 3).

Plaintiff's medical history was otherwise unremarkable until January 2006 when he was diagnosed with Hepatitis C by Defendant Lift, the medical director at TSP. (Doc. no.

---

[1]Though Plaintiff references "B-6" treatments in his affidavit opposing Defendants' motion, Plaintiff's complaint and Defendants' motion for summary judgment all reference a B-12 deficiency. Accordingly, the Court has described Plaintiff's B-12 treatments prior to his transfer to TSP.

[2]By way of background, the Court notes that inmates at TSP have access to medical providers at all times, but TSP does not have a staffed medical facility that is open 24 hours a day. (Doc. no. 65, Ex. C, p. 2) (hereinafter "Burnette Aff."). Rather, the medical facility at TSP is staffed with "in-house medical providers" for 12 hours a day. (Id.). If an inmate needs medical care outside that 12-hour period, he is transported to a local hospital or another prison within the Georgia Department of Corrections. (Id.).

2

65, Ex. A, pp. 1-2) (hereinafter "Lift Aff."). The blood work performed at that time also indicated that Plaintiff might have HIV. (Id. at 3). Because those tests were inconclusive, Plaintiff was referred to the infectious disease clinic. (Id.). Approximately five months later, on May 11, 2006, Plaintiff presented at sick call complaining of lightheadedness and tingling in his feet. (Herman Aff., p. 5). Defendant Herman observed Plaintiff had an abnormal gait and poor balance, but his vital signs were stable. (Id.). In an abundance of caution, Defendant Herman ordered a CT scan and other tests to determine whether Plaintiff had a "neurological pathology, including Toxoplasmosis," a parasitic disease that affects the brain. (Id., Ex. B-6; Lift Aff. p. 4 & Ex. A-6). All of the blood work performed showed that Plaintiff's hemoglobin and hematocrit levels were normal. (Herman Aff., Ex. B-7). Because Plaintiff had a non-anemic hemoglobin level and was exhibiting normal vital signs, Defendant Herman did not believe it was necessary to examine his B-12 levels at that time. (Id. at 5).

On May 16, 2006, Defendant Lift saw Plaintiff for complaints that "he had been feeling bad for a month and had head congestion." (Lift Aff., p. 3). Defendant Lift observed that Plaintiff was again walking with an abnormal gait, which he believed could be indicative of an immuno-compromised patient or a stroke. (Id.). Accordingly, Defendant Lift prescribed an antibiotic and ordered a CT scan of Plaintiff's head to try to determine the underlying medical problem. (Id., Ex. A-4). On May 19, 2006, Defendant Lift followed up with Plaintiff, who said he was feeling better. (Id. at 4). Defendant Lift observed that Plaintiff's "gait was normal and his affect was greatly improved." (Id. at 4 & Ex. A-5). Despite these improvements, Defendant Lift still suspected an underlying medical problem, since Plaintiff's blood work results of May 16, 2006 showed that he was "highly positive for

3

the Toxoplasma IGG antibody," a strong indicator of Toxoplasmosis. (Id. at 4 & Ex. A-6). This disease can be more serious in people with HIV and can also cause encephalitis (inflammation of the brain) and other neurological diseases that can present with symptoms such as those Plaintiff was exhibiting. (Id. at 4).

The medicine given to treat Toxoplasmosis is "very strong and potentially quite dangerous to the patient." (Id.). Thus, patients should receive the treatment "only after it is confirmed to a very high degree of certainty" that the patient is afflicted with this disease. (Id.). The two primary ways to diagnose Toxoplasmosis are to (1) remove a sample of the patient's brain and test for the disease, or (2) perform a CT scan with a dye contrast to look for the infection. (Id. at 4-5). Notably, a CT scan with a dye contrast is more effective than a CT scan without a dye contrast in accurately determining whether a patient has Toxoplasmosis. (Id. at 5). In determining Plaintiff's course of treatment, Defendant Lift consulted with Dr. Keto, an infectious disease specialist, who conveyed the importance of conducting a CT scan with a dye contrast before beginning treatment for Toxoplasmosis. (Id.).

Accordingly, on May 19, 2006, Defendant Lift ordered a CT scan with contrast. (Id.). Plaintiff was sent for the CT scan on May 22, 2006, but he refused to have the CT scan with contrast, claiming he was allergic to the dye, and thus only underwent a CT scan without contrast. (Id.). The results of the scan revealed "no acute focal areas of abnormal attenuation" and "no mass effect or acute intracranial hemorrhage or hematoma." (Id., Exs. A-7 & A-8). After learning that Plaintiff had refused the CT scan with contrast, Defendant Lift met with Plaintiff and explained to him the importance of having such a scan in order to diagnose Toxoplasmosis, especially since there was no indication in any of Plaintiff's prison

4

medical records that he was allergic to the dye used in the CT scan. (Id. at 5-6 & Ex. A-9).[3] At the request of Dr. Keto, Defendant Lift ordered another round of blood work on May 25, 2006. (Id. at 6)

On June 1, 2006, Defendant Lift saw Plaintiff again for complaints of tremors, weakness, and dizziness. (Id.). Even though Plaintiff was alert, his gait was "widened and deliberate." (Id.). While Plaintiff appeared to have dementia, Defendant Lift did not diagnose Plaintiff at that time because Dr. Keto had advised against doing so until the May 25th lab results were back. (Id., Ex. A-10). Following the June 1st appointment, Defendant Lift was informed by Dr. Keto that Plaintiff did not have HIV, and therefore he could not have Toxoplasmosis because it would not be present in patients with normal immune systems. (Id. at 6). Defendant Lift therefore concluded that the May 16th blood work showing high levels of the Toxoplasmosis antibody did not indicate infection, but instead indicated that Plaintiff had simply been exposed to the parasite and his body had produced the appropriate antibodies against the disease. (Id. at 6-7, Exs. A-11 & A-12). Thus, at Plaintiff's follow-up appointment on June 8, 2006, Defendant Lift told Plaintiff that he did not have HIV; however, based on the conflicting and complex lab data, he referred Plaintiff to Dr. Keto. (Id. at 7).

On June 20, 2006, Defendant Lift saw Plaintiff following his appointment with Dr. Keto. (Id.). Once again, Defendant Lift observed poor gait, along with a "mild right facial droop and a left sided weakness," all of which are symptoms of a possible stroke. (Id.). However, Plaintiff's CT scan was normal and his symptoms were not progressively

_____

[3]There is no indication as to whether a CT scan with dye contrast was subsequently performed.

worsening. (Id.). Accordingly, Defendant Lift did not believe that hospitalization was necessary and referred him for a neurological evaluation and an appointment in the co-infection clinic. (Id.). Defendant Lift informed Plaintiff that if his symptoms worsened, he should seek immediate medical attention but recommend hospitalization. (Id. at 7-8 & Ex. A-13).

Because TSP does not have a 24-hour medical facility, inmates with medical issues are sometimes placed in administrative segregation to ensure that they are seen by correctional staff at least twice an hour, 24 hours a day and by medical staff at least once a day. (Doc. no. 65, Ex. D, pp. 2-3) (hereinafter "Madison Aff."). Inmates in administrative segregation have the same access to regular and emergency medical care as other inmates at TSP. (Id. at 2). Notably, administrative segregation is not a punitive measure, and inmates assigned there have the same rights and privileges as inmates housed in the general population. (Burnette Aff., pp. 2-3; see also doc. no. 66, ¶ 28). Up until June 20, 2006, Plaintiff was housed with the general population in the "A" dormitory. (Burnette Aff., Ex. C-2). However, due to Plaintiff's ongoing medical issues, on June 20, 2006, Defendant Madison, a lieutenant and shift supervisor at TSP, was instructed to place Plaintiff in administrative segregation for medical observation and signed an order authorizing Plaintiff's placement in administrative segregation that same day. (Madison Aff., p. 3; Burnette Aff., Exs. C-2 & C-3). On June 22, 2006, Defendant Burnette concurred with the decision that Plaintiff remain in administrative segregation pending medical observation. (Burnette Aff., p. 4 & Ex. C-4).

In response to Plaintiff's allegations that he was living in unsanitary conditions while he was housed in administrative segregation, Defendant Burnette states that he has never had

6

any reason to believe that inmates such as Plaintiff were not checked on by medical staff regularly, had inadequate access to the toilet, or slept on concrete slabs. (Id. at 4). Nor was Defendant Burnette ever informed that Plaintiff had complained about such conditions when he was confined in administrative segregation. (Id. at 5). Records of staff visits reflect that on June 20, 2006, the day Plaintiff was placed in administrate segregation, medical staff made rounds at the F-2 dormitory from 12:20 to 1:05 p.m. and again from 6:33 to 7:00 p.m. (Id., Ex. C-7). On June 21, 2006, medical staff made rounds starting at 8:25 a.m.[4] and conducted them again from 7:10 to 7:24 p.m. (Id.). On June 22, 2006, the medical staff made rounds from 3:50 to 4:00 p.m.. (Id.).

Earlier in the day on June 22nd, however, Plaintiff was found unconscious in his cell and was taken immediately to the medical facility at TSP for an examination. (Madison Aff., p. 3). Upon examination, Defendant Lift ordered that Plaintiff be sent to the emergency room at a local hospital. (Lift Aff., p. 8 & Ex. A-14). Plaintiff was later admitted to Dodge County Hospital on June 23, 2006, where CT scans done with and without dye contrast were negative. (Id. at 8). Plaintiff's treating physician at Dodge County Hospital concluded that Plaintiff was suffering from abnormal dementia and a severe B-12 deficiency. (Id.; see also Pl.'s Aff., p. 3). However, other neurological problems could not be ruled out. (Lift Aff., p. 8). An MRI scan of Plaintiff's brain was also normal. (Id. at 9 & Ex. A-15). Notably, a CT scan performed in September 2006 and an MRI performed in October 2006 showed no evidence of a previous stroke. (Id., Exs. A-16 & A-17). While Defendant Lift followed up

---

[4]The records do not reflect when the June 21st morning rounds concluded.

with Plaintiff's medical providers after he left TSP, he did not personally treat Plaintiff after June 22, 2006. (Id. at 8).

While Plaintiff was hospitalized at Dodge County Hospital, Defendant Farmer, a correctional officer at TSP from April 1995 to April 2008, was assigned to stay with him. (Doc. no. 65, Ex. E, pp. 1-2) (hereinafter "Farmer Aff."). It is standard practice for correctional officers such as Defendant Farmer to ensure that inmates are kept in chains during their hospitalization for the safety of the public, unless prison administration officials have instructed otherwise. (Id.). At no time during Plaintiff's hospitalization at Dodge County Hospital was Defendant Farmer ever informed that he was authorized to remove the chains. (Id.).

On June 23, 2006, prison officials ordered Plaintiff to be transferred to Autry State Prison because it had a 24-hour medical facility. (Burnette Aff., Ex. C-6). On June 27, 2006, Defendant Farmer received a telephone call from TSP informing him to take Plaintiff to Autry State Prison. (Farmer Aff., pp. 2-3). Defendant Farmer was never given any explanation as to why Plaintiff was being transported there, nor was he told that the transfer would be against medical advice. (Id. at 3). Accordingly, Defendant Farmer followed the instructions of his superiors and transported Plaintiff from Dodge County Hospital to Autry State Prison.[5] (Id. at 3-4). Plaintiff did not return to TSP after being transferred to the

---

[5]Plaintiff maintains that he was actually transferred to Milan State Prison. (Doc. no.1, pp. 5-6). While this fact is in dispute, the Court does not consider it a material fact because whether Plaintiff was transferred to Autry State Prison or Milan State Prison following his hospitalization does not affect the outcome of this case. See McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

hospital. (Burnette Aff., p. 4). On June 30, 2006, Plaintiff arrived at Autry State Prison, where he has continued to receive B-12 treatment. (Pl's. Aff., p. 4).

## B. Administrative Grievance Process

At TSP, the grievance procedure is governed by SOP IIB05-0001. Under SOP IIB05-0001 § VI(B),[6] once an inmate has unsuccessfully attempted to resolve a complaint through discussion with the staff involved, the administrative remedies procedure commences with the filing of an informal grievance. The inmate has ten (10) calendar days from "the date the offender knew, or should have known, of the facts giving rise to the grievance" to file the informal grievance. SOP IIB05-0001 § VI(B)(5). The timeliness requirements of the administrative process may be waived upon a showing of good cause. See id § VI(C)(2) & (D). The SOP requires that an inmate be given a response to his informal grievance within ten (10) calendar days of its receipt by the inmate's counselor; the informal grievance procedure must be completed before the inmate will be issued a formal grievance. Id § VI(B)(12)-(13).

If unsatisfied with the resolution of his informal grievance, an inmate must complete a formal grievance form and return it to his counselor within five (5) business days of his receipt of the written resolution of his informal grievance. Id. § VI(C)(2). Once the formal grievance is given to the counselor, the Warden/Superintendent has thirty (30) calendar days to respond. Id. § VI(C)(14). If the inmate is not satisfied with the Warden's response to the formal grievance, he has five (5) business days from the receipt of the response to file an

---

[6]A copy of the SOP for the grievance procedure described herein and in place at the time of the events at issue in this action was submitted by Defendants in support of their motion. (Doc. no. 65, Ex. F, Att. A-3) (hereinafter "Winter Aff.").

appeal to the Office of the Commissioner; the Office of the Commissioner or his designee then has ninety (90) calendar days after receipt of the grievance appeal to respond. Id. § VI(D)(2),(5). The grievance procedure is terminated upon the issuance of a response from the Commissioner's Office. Id.

TSP has a grievance coordinator at TSP who is responsible for ensuring (1) compliance with the grievance procedure, (2) the timely investigation and response to all grievances, and (3) retention of all records and documentation relevant to appeals in the ordinary course of business. (Winter Aff., p. 2). No inmate is denied access to the grievance procedure at TSP, and grievance forms are available to all inmates. (Id.). However, a review of Plaintiff's grievance history reveals that Plaintiff never filed a grievance with respect to any of the issues raised in this action, either before or after he was transferred from TSP. (Id. at 3-4 & Ex. F-2).

## II.  DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Applicable substantive law identifies which facts are material in a given case.[7] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v.

---

[7]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick, 333 F.3d at 1244.

Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929 F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot meet its burden at trial is not sufficient. Clark, 929 F.2d at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

11

**B.     Availability of Administrative Remedies**

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321 (1996), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's mandatory exhaustion requirement applies to all federal claims brought by any inmate. Porter v. Nussle, 534 U.S. 516, 520 (2002). Moreover, the Court does not have discretion to waive the requirement, even if it can be shown that the grievance process is futile or inadequate. Alexander v. Hawk, 159 F.3d 1321, 1325-26 (11th Cir. 1998). Simply put, as the plain language of § 1997e(a) makes clear, if an administrative remedy is "available," it must be exhausted. 42 U.S.C. § 1997e(a); see also Alexander, 159 F.3d at 1326 (explaining that under PLRA courts are "to focus solely on whether an administrative remedy program is 'available'").

Furthermore, the PLRA also "requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 92 (2006). In order to properly exhaust his claims, a prisoner must "us[e] all steps" in the administrative process; he must also comply with any administrative "deadlines and other critical procedural rules" along the way. Id. at 90-91 (internal quotation omitted). If a prisoner fails to complete the administrative process or falls short of compliance with procedural rules governing prisoner grievances, he procedurally defaults his claims. Johnson v. Meadows, 418 F.3d 1152, 1159 (11th Cir. 2005), cert. denied, 548 U.S. 925 (2006). Put plainly, "a Georgia prisoner 'must timely meet the deadlines or the good cause standard of Georgia's administrative grievance procedures.'" Salas v. Tillman, 162 Fed. App'x 918, 920

12

(11th Cir. Jan. 17, 2006) (quoting Johnson, 418 F.3d at 1155); see also Harper v. Jenkin, 179 F.3d 1311, 1312 (11th Cir. 1999) ("Since appellant has not sought leave to file an out-of-time grievance, he cannot be considered to have exhausted his administrative remedies.").

Plaintiff has made allegations of deliberate indifference, retaliation, and unconstitutional conditions of confinement in his complaint. According to the applicable SOP, Plaintiff was required to file an informal grievance regarding these allegations "no later than 10 calendar days from the date the offender knew, or should have known, of the facts giving rise to the grievance." SOP IIB05-0001 § VI. Even though Plaintiff was hospitalized for much of that time and was subsequently transferred to Autry State Prison, he could have filed an out-of-time grievance upon a showing of good cause. See id § VI(C)(2) & (D); (see also Winter Aff., pp. 2-3). Plaintiff does not address the exhaustion issue in response to Defendants' motion for summary judgment. (See generally Pl.'s Aff.). Notably, he does not contend that his hospitalization hindered him from filing a grievance or that he was somehow pressed for time. Moreover, several events of which Plaintiff complains occurred well before his hospitalization, for which Plaintiff never filed a grievance.[8]

In sum, Plaintiff's grievance history demonstrates that Plaintiff has not filed a grievance, timely or otherwise, much less completed the grievance process, with respect to any of the claims he makes in this civil action. (Winter Aff., Ex. F-2). Thus, even construing the facts of this case in the light most favorable to Plaintiff, he has failed to raise any question of fact, let alone a material question of fact, regarding his exhaustion of administrative

---

[8]For example, Plaintiff knew in 2001 when he was transferred to TSP and Defendant Herman did not renew his prescription of B-12 medication that he was not receiving the same B-12 treatment that he had previously received. (See Herman Aff., pp. 1, 3).

remedies. As Plaintiff did not file any grievance with respect to any claims raised in this action, he has failed to exhaust his administrative remedies prior filing his complaint. Therefore, Defendants are entitled to summary judgment on all of Plaintiff's claims as a matter of law.

## C.     Merits of Plaintiff's Claims

### 1.     Deliberate Indifference Claims

Even assuming Plaintiff had properly exhausted his administrative remedies, his deliberate indifference claims must fail on the merits. To survive Defendants' motion for summary judgment on these claims, Plaintiff must produce evidence from which a reasonable jury could conclude: (1) that he had an objectively serious medical need, (2) that Defendants acted with deliberate indifference to that need, and (3) that his injury was caused by Defendants' wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007) (citations omitted). Though the parties do not present arguments regarding whether Plaintiff's B-12 deficiency was a serious medical need, construing the facts of the case in the light most favorable to Plaintiff, the Court assumes *arguendo* that this deficiency did constitute a serious medical need under the first prong of the Goebert test. However, Plaintiff has not shown that Defendants acted with deliberate indifference to that need.

To show that Defendants were deliberately indifferent to his medical needs under the second prong of the Goebert test, Plaintiff must offer some proof that Defendants: (1) were subjectively aware of a serious risk to Plaintiff's health, and (2) that Defendants disregarded that risk by (3) following a course of action which constituted "more than mere negligence." Goebert, 510 F.3d at 1326. Plaintiff was transferred to TSP in late 2001. Upon arrival at the prison, Defendant Herman ran tests showing that Plaintiff's B-12 levels were normal and

14

accordingly did not renew his prescription for B-12 treatment. (Herman Aff., p. 2). Notably, in reaching this determination, Defendant Herman relied on the recommendation of a physician from Hays State Prison who had previously treated Plaintiff and had advised that Plaintiff's B-12 treatment be discontinued. (Id. at 3). Each time Plaintiff presented to Defendant Herman or Defendant Lift for medical treatment, these Defendants promptly and thoroughly attended to his medical needs. They prescribed antibiotics, consulted with outside specialists, followed up with Plaintiff regularly, and ordered multiple tests to ensure that Plaintiff was not suffering from a serious illness. (Herman Aff., pp. 1, 3-5 & Ex. B-6; Lift Aff., pp. 4-5, 7 & Ex. A-4). Notably, all the lab tests and x-rays performed showed no sign of infection or serious illness. (Herman Aff., Ex. B-7; Lift Aff., pp. 3, 5, 7 & Exs. A-4, A-7, A-8). Accordingly, although Defendants Herman and Lift may have been aware of a risk to Plaintiff's health, nothing in the record indicates that they disregarded that risk or were otherwise deliberately indifferent to Plaintiff's medical needs.

As to Plaintiff's allegations against Defendants Madison and Farmer, neither Defendant is medically trained, nor does the record demonstrate they rendered medical treatment to Plaintiff or participated in rendering medical treatment to Plaintiff. (Madison Aff., p. 2; Farmer Aff., p.1). Rather, both Defendant Madison and Defendant Farmer relied upon the clinical determinations of the medical staff regarding Plaintiff's medical condition in taking their respective actions. (Madison Aff., p. 3; Farmer Aff., p. 3); accord Waldrop v. Evans, 681 F. Supp. 840, 848-49 (M.D. Ga. 1988) (finding that prison administrators who are not medical professionals must rely on decisions of trained professionals regarding care provided to inmates). As these two Defendants were relying on the information provided by

the medical staff regarding the treatment Plaintiff was receiving and/or needed, and as they were not informed that Plaintiff needed additional or different treatment, they did not possess the necessary subjective intent to establish an Eighth Amendment violation. That is, they did not know about and disregard an excessive risk to Plaintiff's health or safety. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). Thus, they were not deliberately indifferent to Plaintiff's medical needs.

In sum, this is not a case where Defendants refused to provide treatment to Plaintiff. Rather, as discussed in detail above, Defendants Herman and Lift addressed Plaintiff's symptoms promptly and thoroughly. They ordered blood work and CT scans, consulted with outside specialists, and followed up with him on a regular basis. None of the tests performed indicated that Plaintiff was suffering from a condition that necessitated immediate hospitalization or more aggressive treatment. While Plaintiff did collapse and require hospitalization, there is nothing in the record to indicate that Defendants knew or should have known that Plaintiff's medical condition would lead to these results. Furthermore, Defendants Madison and Farmer appropriately relied on the decisions of medical staff in taking their respective actions. Simply put, Defendants Herman, Lift, Madison, and Farmer did not act with deliberate indifference to Plaintiff's medical needs, and even assuming that Plaintiff did exhaust his administrative remedies, they are entitled judgment as a matter of law on these claims.[9]

---

[9] At his deposition, Plaintiff for the first time alleged that Defendant Herman was also deliberately indifferent to his skin condition and his need for insulin. (Doc. no. 65, Ex. G, pp. 22, 24-26). While this claim has not been sanctioned by the Court, in an abundance of caution, it is addressed herein. In response to the statements made by Plaintiff at his deposition, Defendant Herman avers that he promptly and thoroughly treated Plaintiff's skin conditions by providing him with various soaps, creams, and antibiotics. (Herman Aff., p.

## 2. Conditions of Confinement Claim

Plaintiff's claim against Defendant Burnette regarding the alleged conditions of confinement in administrative segregation must also fail, as Plaintiff has failed to demonstrate that any conditions of his confinement violated his constitutional rights. To begin, Plaintiff's only attempt at demonstrating that he was subjected to unconstitutional conditions while in administrative segregation comes from his own self-serving, conclusory allegations made in his complaint. (See doc. no. 1, pp. 10-11). At this stage, naked accusations are no substitute for evidence and do not defeat summary judgment. See Leigh v. Warner Bros. Inc., 212 F.3d 1210, 1217 (11th Cir.2000) (conclusory allegations without specific facts in support have no probative value). Indeed, to survive summary judgment, Plaintiff must "put forward specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (internal citation and quotation omitted). Here, Plaintiff has failed to provide anything more than the conclusory allegations in his pleadings regarding his conditions of confinement claim. Although Plaintiff alleges that he lived in inadequate and unsanitary conditions, that

---

4). In addition, he notes that Plaintiff's medical records did not show that he had ever received or needed insulin. (Id.). Plaintiff fails to refute Defendant Herman's statements in his affidavit opposing Defendants' motion for summary judgment. (See generally Pl.'s Aff.). The Local Rules of this Court provide that failure to respond to a motion within the applicable time period "shall indicate that there is no opposition to a motion." Loc. R. 7.5. This rule applies even where a party responds to part, but not all, of a motion. See Street v. City of Bloomingdale, No. CV 406-256, 2007 WL 1752469, at *2 (S.D. Ga. June 15, 2007); Catalano v. GWD Mgmt. Corp., No. CV 403-167, 2005 WL 5519861, at *6 (S.D. Ga. Mar. 30, 2005). Even if these claims had been sanctioned by the Court, as Plaintiff has not evidenced any opposition to this portion of Defendants' motion for summary judgment, this portion of the motion is deemed unopposed. Accordingly, Plaintiff has failed to create any genuine issue of material fact, and Defendant Herman is entitled to summary judgment on these claims as well.

medical staff did not check on him daily, that the toilets were inadequate, and that he was forced to sleep on a concrete slab, he fails to provide any evidence, much less any admissible evidence, of these conditions. Notably, Defendant Burnette specifically denies knowledge of these conditions and has produced evidence showing that the TSP medical staff made rounds in the administrative segregation unit on the days preceding Plaintiff's collapse. (Burnette Aff., pp. 4-5 & Ex. C-7). Again, Plaintiff fails to refute any of Defendant Burnette's statements in his affidavit submitted in opposition to Defendants' motion, and there is no evidence in the record to indicate that Plaintiff was subject to any unconstitutional conditions of confinement while he was housed in administrative segregation.

Although the Court initially sanctioned this claim as "sufficient to carry this cause of action through the service of process stage," Plaintiff has not presented such *evidence* as to withstand Defendants' motion. Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984). Furthermore, as the Court has determined that Plaintiff has not shown that his constitutional rights were violated in this respect, Plaintiff may not maintain a § 1983 action for supervisory liability against Defendant Burnette. See Hicks v. Moore, 422 F.3d 1246, 1253 (11th Cir. 2005) (reversing of district court's denial of summary judgment, because the Eleventh Circuit concluded that plaintiff's constitutional rights were not violated, thus, plaintiff could not maintain a § 1983 action for supervisory liability against the defendant). As such, Defendant Burnette is entitled to summary judgment on Plaintiff's conditions of confinement claim.

### 3. Retaliation Claim

Finally, Plaintiff's claim that Defendant Burnette retaliated against him by placing him in administrative segregation also fails on the merits. In order to prevail on a claim of

retaliation, an inmate must establish three elements: "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the . . . allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008) (citation omitted). Here, though Plaintiff has not specified what constitutionally protected speech he engaged in, the Court notes that Plaintiff's grievance history reveals that he filed several other grievances between 2001 and 2004, before his placement in administrative segregation. (Winter Aff., Ex. F-2-). Thus, viewing the evidence in the light most favorable to Plaintiff, the Court assumes *arguendo* that Plaintiff is arguing that he was placed in administrative segregation for filing these grievances. Based on that assumption, there can be no doubt that Plaintiff's speech was constitutionally protected, as the First Amendment prohibits prisons officials from retaliating against inmates for filing lawsuits or administrative grievances, or for exercising the right of free speech. Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003); Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986).[10]

However, under the second prong of the Mosley test, the Court does not find that placement in administrative segregation would likely deter the ordinary inmate from filing grievances. Indeed, the record demonstrates that placement in administrative segregation is not a punitive measure. (Burnette Aff., p. 2; see also doc. no. 66, ¶ 28). Rather, inmates

---

[10]See also Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (*per curiam*) (noting that prison officials may not burden an inmate's First Amendment rights "with practices that are not reasonably related to legitimate penological objectives" or "act with the intent of chilling that First Amendment right").

with medical issues may be placed in administrative segregation to ensure that they are monitored more closely by both correctional and medical staff. (Madison Aff., pp. 2-3; Burnette Aff., p. 3). These inmates have the same rights and privileges and the same access to regular and emergency medical care as inmates housed in the general population at TSP. (Madison Aff., p. 2; Burnette Aff., p. 3; doc. no. 66, ¶ 28). Accordingly, the Court finds that placement in administrative segregation under the circumstances of this case would not have a deterrent effect on filing grievances for the ordinary inmate.

Furthermore, Plaintiff cannot show a "causal relationship" between the retaliatory action and the protected speech under the third prong of the Mosley test. A causal relationship can be shown by "demonstrating that the prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.'" Farrow, 320 F.3d at 1248 (citing Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989)). The Eleventh Circuit has ruled that "[d]irect evidence of an illegal motive will usually suffice to create a genuine issue of fact and preclude summary judgment." Harris, 65 F.3d at 917.[11] Where a plaintiff has failed to establish a causal connection between his protected conduct and the alleged retaliatory action, summary judgment for the defendant is proper. Farrow, 320 F.3d at 1248-49.

Here, Plaintiff has failed to produce any evidence of a causal relationship between the filing of these grievances between 2001 and 2004 and his placement in administrative

---

[11]In Harris, the Eleventh Circuit reversed the district court's decision granting summary judgment where the prisoner plaintiff submitted corroborating affidavits from fellow prisoners that stated a prison official commented that he filed disciplinary reports against the plaintiff, at least in part, in retaliation for prior litigation. Harris, 65 F.3d at 917.

segregation two years later.[12] It is undisputed that Plaintiff had been seen and treated by Defendants Herman and Lift for medical reasons immediately prior to his placement in administrative segregation. (See generally Herman Aff. & Lift Aff.). Furthermore, inmates with medical issues may be placed in administrative segregation to ensure that they are monitored more closely by correctional and medical staff. (Madison Aff., pp. 2-3; Burnette Aff., p. 3). Accordingly, on June 20, 2006, Plaintiff was placed in administrative segregation for medical observation, and Defendant Burnette concurred with Plaintiff's placement on June 22, 2006. (Id. at 4, Exs. C-3 & C-4).

Plaintiff does not refute these factual statements in his response to Defendants' motion, and thus the record establishes that Plaintiff was placed in administrative segregation not in retaliation for filing grievances, but instead for his own well-being because of his ongoing medical issues. The Court also notes that a causal relationship in this case is doubtful at best, as nearly two years elapsed between the filing of his last grievance in 2004 and his placement in administrative segregation in 2006. In sum, Plaintiff has failed to show a causal connection between the filing of his grievances and his placement in administrative segregation or any evidence of an illegal motive. Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiff's retaliation claims.

---

[12]The Court notes that Plaintiff's grievance history demonstrates that he filed a grievance in 2008, but this grievance obviously post-dates his placement in administrative segregation. (See Winter Aff., Ex. F-2). By its very nature, the concept of retaliation implies that the individual performing the retaliatory act did so in response to some prior act of the person retaliated against. Thus, any suggestion that Plaintiff's grievance filed in 2008 prompted the alleged retaliation cannot withstand logic, as his placement in administrative segregation took place before Plaintiff filed his grievance in 2008. Accordingly, the Court need not consider the 2008 grievance as a basis for Plaintiff's retaliation claim.

In sum, Plaintiff has failed to exhaust his administrative remedies with respect to any of the claims made against Defendants, and Defendants' motion for summary judgment is due to be granted on that basis alone. Even assuming that Plaintiff had properly exhausted his administrative remedies, Plaintiff has failed to create any genuine of material fact regarding the merits of his deliberate indifference, conditions of confinement, or retaliation claims, and Defendants are entitled to summary judgment on the merits of Plaintiff's claims as well.

### III.  CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED**, that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of Defendants.

SO REPORTED and RECOMMENDED this 2day) day of July, 2009, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE